Good afternoon, Your Honors. My name is David Ness. I'm with the Federal Public Defender's Office in Great Falls, Montana. I represent Mr. Elmer Red Eagle, the appellant in this case. This case presents a rather straightforward issue, at least insofar as the first and what involved in the appeal. What it requires the court to determine is the reach of the involuntary homicide statute and to apply the rules defining the mental states of recklessness and wantonness to some rather unique facts. Mr. Red Eagle was convicted of involuntary homicide for the death of his two-month-old son. As the court is aware from reading the briefs, the death of his two-month-old son was caused when Mr. Red Eagle, while in an intoxicated state, rolled over on his son and smothered his son, resulting in his son's death. Prior to trial, we presented jury instructions and presented an argument throughout the trial that Mr. Red Eagle's conduct, albeit negligent and reprehensible in a number of ways, did not rise to the level of recklessness or wantonness, as those terms have been defined by the United States Supreme Court and applied by this Court in cases following the Farmer B. Brennan case. As the court is aware, recklessness has been defined as a conscious disregard of a known risk. Wantonness has been defined as a conscious failure to act to prevent a known and inevitable injury. When in reviewing the cases, both state and federal, it appears as though the cases applying involuntary homicide statutes or manslaughter statutes or the statutes of the like generally fall into two groups. There are those cases that involve inherently dangerous conduct, that the conduct in and of itself, it would place a person on notice of the risk involved with that conduct, and those cases involving a defendant that has received actual notice or been placed on actual notice through a statute or otherwise, that his or her conduct presents unusual and dangerous risks. In this case, there was no, the conduct, we argued in the court below, we argued to this extent, that the risk of getting drunk and going to sleep with an infant is not something that is so inherently dangerous that it would place a person, nor could a jury reasonably infer that a person is naturally on notice that that type of conduct would result in some sort of serious injury or death. Nor was there any evidence presented by the government that Mr. Red Eagle had been placed on any notice that this sort of conduct would naturally result in the death of his infant son. In the Farmer v. Brennan case, the United States Supreme Court, in reviewing notions of criminal recklessness, indicated that criminal recklessness requires, it almost slides to the point in the scale where there's an intent to cause an injury. It almost requires a malevolent intent on the part of the actor to cause an injury. Here what we have is we have a father who, while drunk, takes his infant son and decides to sleep with his infant son. There's nothing indicating that in that action in and of itself that Mr. Red Eagle acted with an extreme indifference to the life and safety of his son, or almost with a knowing and conscious disregard for the safety and health of his son. Nor is there any sort of evidence, and this sort of evidence is talked about in the Seventh Circuit case or the McGill case, kind of the predecessor to the Farmer case, that would indicate that Mr. Red Eagle had ever been placed on notice that his conduct presented these sorts of dangers. The McGill case itself talks about normally that when a prisoner, for example, tries to establish deliberate indifference or criminal recklessness on the part of the guards that normally the way they do that is they present evidence that the guards have been placed on notice that the inmate is in danger or something. Similarly, in the cases that were cited and discussed in both the government's brief as well as the defendant's brief, the cases seem to suggest that. The Bonnehon case, the case from the state of Georgia, although that the conviction was upheld over a vigorous dissent, there was evidence indicating that the defendant had, in fact, been placed on notice of her conduct and the dangers associated with her conduct. That wasn't done here. Now the question is, did the government present through other evidence, evidence that would tend to support a jury verdict that Mr. Red Eagle was new or had reason to know that the his conduct as he engaged in that night and sleeping with his child in an intoxicated state would lead to the sort of tragic consequences that occurred in that case. The evidence says it was submitted by the government and through cross-examination indicated that the practice of sleeping with baby Elmer was something that was, that, that, that was of regular usage in this family. They, they slept with this child almost on a nightly basis. The child's mother talked about that. Mr. Red Eagle talked about that. The Red Eagle daughters talked about that. That it was, in fact, common practice for this child to sleep with the parents. And in conformity with that practice, Mr. Red Eagle did that on the night that this occurred. Without some sort of actual notice to him that would indicate to him that he shouldn't engage in that sort of conduct, I would assert that finding a reckless or wanton state of mind in this case, and it based upon the family practice that was common in that household, was something that just wasn't there. And so for that reason, the district court erred in not granting the Rule 29 motion here because there simply was not enough evidence for the jury to come to the conclusion that he acted in a reckless and wanton state of mind. It's extremely important, I think, that the court act on the Rule 29 motion in a case such as this, a case that involves an issue that is so highly emotional and so highly tragic. And for that reason, I think that the court in this case, perhaps more than other cases, with an appropriate view of the evidence, should have dismissed the charges against Mr. Red Eagle and should not have acted in that way. The second issue that I wanted to touch on just very briefly has to do with the district court's decision to depart upward in this case. The district court departed upward based upon a number of tribal convictions, and we've briefed that issue fairly well on both sides. But in this case, the district court stated on several occasions in justifying this departure that he was relying upon these 45-odd convictions. He did not, I don't think, as the government states in its brief, indicate that he was relying on the conduct underlying those convictions. He repeatedly mentioned the 45-some-odd convictions, and he treated them as if they were convictions coming out of a state court. The case law that we've summarized, the Arsinger case on down through Shelton v. Alabama and the Nichols case, indicates that the district court erred in relying upon these uncounseled tribal misdemeanors to actually add up and rack up points under the sentencing guidelines to increase Mr. Red Eagle's criminal history category. And so for that reason, I think that the district court not only erred in refusing to dismiss the charge before it went to the jury, but even assuming that the court would affirm on that ground, the district court erred in its reasoning for departing upward in this case. I have a difficulty with your argument on the sentence enhancement or upward departure, and here's what it is. The sentencing guidelines let sentencing judges take into account any number of things that aren't crimes themselves as grounds to enhance a sentence. And so I don't see why the sentencing guidelines should be enhanced, which are basically a congressional act as I understand it. You can't say if you get a tribal court conviction, your sentence is enhanced, even though you didn't get counsel in the tribal court. They could say if you're a leader of an enterprise, your sentence is enhanced. Or if you have a vulnerable victim, your sentence is enhanced. And those things aren't independently crimes. So I don't see why the they can't say if you get a tribal court conviction, your sentence is enhanced, even if, even though we don't require counsel to defend you in that. So what am I missing? Well, I think we're walking kind of a tight line here, because the court can certainly look to underlying conduct and can use that underlying conduct to enhance someone's sentence. And therefore, a court could look at tribal court convictions and then to enhance them, take notice of the underlying conduct, and use that underlying conduct as it would acquitted conduct, for example, or civil adjudication, say under the SEC or something, to use that to depart upward. But where we run into problems, I think, under the Nichols case and on down through Shelton versus Alabama, is when you rely strictly on the convictions themselves. And so I think that a court walks a rather tight line here, because I don't think it's appropriate to use an uncounseled conviction to enhance someone's sentence. And you're certainly doing that under the sentencing guidelines when you bounce someone up from criminal history category one to criminal history category four. But it's correct, isn't it, that Congress, when they said you can enhance for convictions, lists tribal court convictions? They said that they could be used. So if Congress has said that, then what's the authority that would say that if Congress said they can be used, they can only be used in a subset of cases where the accused had counsel in the tribal court? I think if you interpret that rule to say that what the Sentencing Commission said is that a court can use simple tribal court convictions to enhance someone's sentence, what you're going to have is you're going to have a tension between the Nichols line of cases and this Court's decision in Brady and on through Shelton versus Alabama with the guidelines. Those cases said that as a constitutional matter, you cannot use an uncounseled demeanor that results in jail time or in suspended sentence to increase someone's sentence. You can, however, look to the underlying conduct. So the question here is what did the court do? Did the court use the underlying conduct in these convictions or did the court rely on the convictions themselves? I see. Okay. I understand your argument. Could you just answer another question out of curiosity again? Your client is in jail. Was there a bail motion made in this case? He was placed in jail after having found to have violated the conditions of his release. I have not made a bail motion yet because it's a crime of violence and it's extremely difficult to try to prevail on that. It was my intention that as we get closer up to 18 months, which would be the top of his guideline range, if he fell within Category 1, to make that motion. But no, I have not filed a bail motion simply because I think that the law is against me given the fact that this is considered to be a crime of violence and given the fact that he was placed in jail after having found to violate the conditions of his release. Okay. Thank you. And if I have nothing further, I'll reserve the rest for rebuttal. Good afternoon, and may it please the Court. I'm Marcia Goodsept, and I'm an AUSA from the District of Montana, and I was also trial counsel in the Court below. I have to start in an unfortunate position, which is an apology to this Court for a miscitation on page 43 of my brief. Page 43 of my brief indicates that Bradyville also argues that Brady v. Maryland dictates the result here, and I make the comment that that case is no longer good law. Obviously, Brady v. Maryland is still very good law, and it has nothing to do with this case. It's United States v. Brady, a Ninth Circuit case, that should be the citation there, 928F2nd 844, Ninth Circuit, 1991, and I apologize to the Court. I found that this morning at about 2 o'clock in the morning when I was yet reviewing my brief again. How about the 8J letter sending in an unpublished disposition? Because that case that I cited you to, while it is unpublished, it was referenced in this brief as a related case. If you look at the United States Statement of Related Cases, United States v. Denise Fast Horse raised the identical issue to issue 3 here, which you've discussed in your mind. Kennedy So we should use that just so that we know what happened to the related case. O'Connell Exactly. And that was the purpose in my citing to you to that case, because literally the briefs are almost as identical as they could possibly be. Mr. Ness and I. Kennedy And that's only on the sentencing issue, right? O'Connell That was on the sentencing issue of the upward departure. Mr. Ness and I both handled that case as well in front of the same judge. The briefs are basically identical. And in that case, the Court held. Kennedy Even with respect to Brady v. Maryland? O'Connell Unfortunately, I had to do the same thing. Yes. Kennedy I shouldn't be. O'Connell Yes. It was there. And so I managed to find it in that one as well. But in that case, in the Fast Horse panel, they held what the government's position argued was, which was it was clear that the judge was looking at the conduct underlying those convictions in operation. Kennedy Okay. We're not going to talk about what they did in that case, since it didn't really happen as far as we're concerned. O'Connell In somewhat of a fashion, yes. I'd like to first address what I think we all have to agree is the main issue in this case, because if, in fact, you believe the defendant's argument that Elmer Red Eagle Sr. was not grossly negligent and was not acting with reckless disregard or wanton conduct with regard to his son, then obviously this case gets dismissed and we don't get to the other three issues. Kennedy And I take it, given the instruction that you got, it is your position that he must have had, quote, must have, quote, acted with awareness of the risk. O'Connell Yes. Kennedy Otherwise, it's not a valid conviction. O'Connell Exactly. Yes. Kennedy What evidence did you have that he was aware of the nature of the risk of sleeping drunk with the baby? O'Connell Interestingly enough, it's not – and see, this is where I have such a strong objection to how this case has been phrased. This defendant was not convicted because he fell asleep. This defendant was convicted and Judge Haddon was very careful in denying the Rule 29 motion. And I think he gave some significant thought to this Rule 29 motion as evidenced by the transcript. And then again, it's sentencing. This defendant's wrongful conduct in this case that got him to where we are was taking the child from a position of safety where the child was being cared for by his sisters and placing him in a position of non-safety. It wasn't just that he fell asleep. Kennedy So if he had just come back drunk and the child had been in the bed, he wouldn't have been guilty of a crime. O'Connell Probably not, because if he would have had no idea that the child was there – Kennedy No, no. He knew the child was there and he got into bed drunk and thought, you know, I sleep with the child, I'm drunk, I'm going to bed. He would not have been guilty of a crime. I think it's a much more difficult conviction, and I'm, you know, unfortunately in this case I think you're probably accurate in that. If, in fact, the mother had been in bed and the child was sleeping there, but this defendant made a conscious effort, and that was noticed by the judge in the Rule 29 argument, and again it's sentencing. He made a conscious decision to take that child from a position of safety where he's being cared for by his sisters and placed him in the position on the bed and then even said to the daughter who tried to retrieve him, don't take that child or I'm going to spank you. And that was the Rule 29 argument that carried the biggest weight for Judge Haddon. Kennedy Let me ask you this, though. I understand the sequence and your argument is not a trivial argument, but you have to show that he was aware of the risk that he was thereby creating. That is to say, you have to show that he was aware of the risk of sleeping drunk with the baby. And I – and interestingly enough in this case, I point to the defendant's testimony, a witness that the defendant used fairly heavily. If you look at excerpts of record page 54, which is the testimony from the trial transcript that characterizes Mamie Red Eagle's testimony, and if you look at pages 206 and 207, she testifies that the defendant asked his wife not to drink that night because she was supposed to watch the children. Page 206, and that would be line 15 through line 20 and 21, 22. This is Mamie Red Eagle who is – I'm trying to think if she is – I believe she's his sister, his younger sister or a first cousin. And she's indicating that, in fact, she overheard Elmer Red Eagle telling Tanya, being Tanya is his wife, not to drink because he wanted her to provide care for the baby. And also in Mr. Ness's closing – Well, that's different from the risk of sleeping with the baby. No. It's risk of caring for the baby. That's – that's the situation. You shouldn't drink because you need to watch the children. She had to watch the baby. Exactly. And watch implies you're awake watching the baby. Well, I don't believe so. I believe that it was in the context of you're the mom, I'm going to get drunk, you stay sober, you take care of the children. Because there was testimony there were a number of other – there were other children in the residence, the baby being the youngest one, obviously, at 2 months. And mom had done that. Mom had taken care of the child. There was some testimony about her changing the baby's pamper and giving the baby a bottle when the baby had woken up, placing the baby back in bed with the girls because she was concerned about Elmer's conduct when he was drinking. And it's – that is the problem there. He knew that it wasn't safe for him to care for the child. He knew that it's not a good idea for the mother if she's caring for the baby that evening, taking care of the baby, that she shouldn't get drunk. And you think that gives him the awareness that – That's his own awareness, Your Honor. It's his own awareness that people who are drinking shouldn't be taking care of children. He, his intention that night very clearly stated was, I'm getting drunk. Everybody says that. 30 to 40 beers minimum, .27 hours after this happened. And he says to his wife, you don't drink so you can take care of the children. And, in fact, he was very careful not to drive. That's pointed out in the closing argument. Because several people needed rides home and rides here and there. And he knew that he was in no shape to do any of those things. Any evidence that at the Fort Peck Indian Reservation or any other community in which he'd lived, there had ever been, you know, a public incident of an infant being killed in this manner? There is no evidence in this record for you to consider about that. So no evidence in front of the jury on that point? That's correct, Your Honor. And if you also look at, this is a defendant who, you know, in the pre-sentence report, this is a defendant who has a number of alcohol-related convictions for not only DUI but for child neglect and child endangerment, was convicted in tribal court. And I think if you look at, there are a number of pages, a host of pages in the pre-sentence report that detail his prior criminal history, including not just DUIs but child neglect and child endangerment. And if you look at page 34 of my brief, it talks about a number of other different kinds of child neglect, contributing to the minor domestic abuse, all of his underlying conduct of those convictions being alcohol-related. Alcohol was a big problem in this man's life. Well, yeah, and I'm trying to figure, I mean, I'll say the obvious. This is just a horrible, horrible case. Absolutely. But how does it cut that he's had obvious and severe alcohol problems for years? Yes. Yet it appears that the custom in that house was to sleep with the baby. So in other words, he slept with not only this baby but previous babies drunk many times. I don't know that there's testimony about previous children. I know that there was testimony about this baby, certainly, being about 8 weeks old, didn't prefer the bassinet as much as preferred sleeping with parents. But interestingly, the alcohol problem in this case is the defendant's. There isn't any discussion about what the mother is doing with the baby when they're all sleeping together, if she's sober or not. And there's also no evidence in the record from which we can infer that this was a continuing pattern of her allowing him to be drunk and sleeping with the baby. I think that's the leap we cannot make. But the burden is on you to show that he's aware of the risk. Exactly. And I believe that that is in his own conduct of saying specifically to his wife, I'm going to get drunk and I can't take care of the children. I want you to stay sober then so you can take care of the children, especially this little baby. But if that's all you've got, you see, I wish you had more because that says watch the children. It doesn't say I don't want you to get drunk because I don't want you to sleep with the children. But, see, I think that what we're mistaking is we're taking the position that I don't agree with in the defendant's brief, which is his only problem was this guy fell asleep and the baby was in the wrong place at the wrong time. He passed out drunk on a child he had placed there and had taken from a position of safety. And if he should have been aware of the risk that he was thereby creating, I agree with you, and you need some evidence that shows us awareness of the risk. And I believe that that awareness is a common sense awareness, in addition to his own awareness that he shouldn't drive when he was drinking and didn't drive. And there were various other things that he chose not to do, let other people do various things when he was at that party that was at his residence, which goes right into the definitions that the judge used. It just doesn't seem to me that somebody who gets drunk is likely to be aware that if he goes into the bed with his baby, that he's going to kill him. And you know when you go out drunk driving that you've got a good chance you're going to end up in an accident. You may kill somebody. But, you know, I bet there are a lot of people who come home drunk and get into bed with their babies. I guess I would disagree on a couple points here. One is that his voluntary intoxication. I mean, what is it that tells somebody? You know, it seems to me it's quite sensible when he says to the mother, you know, if you're going to take care of the baby tonight, this is a good night for you to stay sober. That's good advice. But who does it occur to that if you get into bed drunk with the baby that you may kill the baby? You're again making that shift. And the shift is it's not just the getting in bed with the baby drunk. He took this. It doesn't occur to you that if you get in bed with a baby drunk that you're going to kill it. It's no more likely to occur to you that if you put the baby in the bed and then get into it, you're going to kill it. This is the problem here, though, is that it's not just the putting the baby on the bed. It's the going into a place where this child is safe and saying, I'm now going to take care of this baby who's only two months old and completely helpless, and I'm going to be this baby's primary caretaker. I don't care at that point. I'm not going to be a caretaker. I'm going to get in to put the baby in bed. I'm going to get into bed. If you think it's no great the person wouldn't know the risk, wouldn't meet this test of disregarding a risk of harm of which you're aware. If you got into bed with the baby there, I don't see how you're any more disregarding the risk by putting the baby there. If you don't – if you're not aware that getting – then getting into bed is going to create a risk of killing the baby. Because his risk in this case was choosing to provide care for an infant. And we have to keep in mind this is a two-month-old baby. This is not a 12-year-old child or a two-year-old child who's absolutely completely helpless. And that is the circularity to the argument is I just fell asleep where this child wasn't supposed to be. He moved this child specifically into this place and decided that he was going to provide care for this child after he told his wife, you stay sober, I'm going to be drunk, I don't want to take care of these kids. And that is the wholeness of this argument in this case. You can't just say – Well, it's a nice argument. Well, you can't just say, well, he fell asleep and so therefore he's not guilty. If in fact he had not gone and taken this child away and tried to discipline the other older child, the 12-year-old, who was coming to get the child and to take care of the child, then there's a much better argument and a much better case that the government may not have brought to say, you know, this was a horrible accident. But the defendant in this case, number one – How does that cut? If he's aware of the risk, why in the world is he saying to the 12-year-old, I'm going to spank you if you take this baby out of here? Probably because he's at least – he's more than a .27. That's the problem here is – and I think Judge Haddon recognized this in crafting his jury instructions. This defendant was completely drunk. There isn't anybody who's going to disagree with that. But at the same time, the law clearly says he is responsible for his own actions even though he's voluntarily intoxicated. That is not a defense in this case. And so that is the whole crux of the case, is this is a drunk guy who does something he probably wouldn't have done when he was sober and knew there was a problem with because he told his wife, you stay sober and take care of the kids because I'm not going to because I'm going to be drunk. And that is the problem here. So the issue really isn't what did he know when he was putting the baby into the bed. Exactly. What should he have known when he got drunk? That's absolutely it. But I keep looking for the evidence as to what should he have known about the risk of sleeping drunk with a baby. It's not just sleeping drunk with a baby because that's where we start here again with just when he lays – Exactly what it is. He's sleeping drunk alone in the bed with the baby. He creates that by putting the baby in the bed. Exactly. But the question is what does he know about the risk that he is thereby creating? Well, but he's only creating that risk because you have to go back farther. Had one of the girls laid that baby on the bed and not said anything to anybody? And I'm terribly sympathetic with the government's prosecution here, and I'm trying to figure out a way. Before he gets drunk – Okay. When he's at the position of trying to decide, which is – The evening. You don't take somebody who's 2.7 drunk and say – that's the Mandrea defense that I think was properly put to one side. Right. The question is when he's not drunk, is he aware of the risk that would be created by sleeping alone in the bed with the baby drunk? And I say absolutely because he specifically asks his wife to stay sober so she can care for the baby. That's the point of the evidence you have. Absolutely. But, of course, he doesn't say, I don't want you to get drunk and go to bed with the baby. He says, I don't want you to get drunk because I want you to watch the baby. Right. And to me, that's the same thing. You know, we're talking 2-month-old baby needs – Related, but they're not the same thing. They're not exactly the same thing. But we're talking 2-month-old baby who needs constant watching versus a toddler who maybe gets out of the bed in the middle of the night and needs a diaper change versus a 12-year-old who sleeps through the night. May I ask you, what do you make of the Supreme Court statement in Farmer v. Brennan that for civil law, the person's reckless who acts in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known, the criminal law, however, is the next sentence, generally permits the finding of recklessness only when a person disregards the risk of harm of which he is aware. And this is a defendant who is aware of the harm. So it's not that it's so obvious it should be known. No. That's not enough. It has to be one he's actually aware of. In the criminal context, absolutely. And in this case, we have a defendant who has a huge number of alcohol-related convictions, some of which include alcohol-related convictions involving his children. We also have a defendant who knows enough about taking care of a 2-month-old because he did it during the day. The testimony was the mother was working during the day and was employed full time, and he was providing care for that child during the day. Your argument is because he told the mother, stay sober while you take care of the baby, that that shows he's aware of the risk of caring for the baby while intoxicated. Absolutely. And especially a baby of this tender age. That is the huge problem in this case. And his willingness to say, well, he's drunk, and obviously under no great thought processes there, to go get this child and decide that he's going to be the caretaker, and then puts this child in the position of harm where this child ends up dead, suffocated, laying crossways, actually, as the testimony was, that the father was laying with his head in the pillow, passed out when mom came in, baby was laying underneath his hips with feet sticking out this way, head and lungs right under this way. So it wasn't even like he had placed child in bed to sleep next to him, as one might do in cradle-child. This was a baby who was just laid here and a dad who just plopped on top of him and passed out drunk. Briefly, with regard to the other issues, I think you've made the point about the tribal court convictions that, in fact, in this case, it was very clear from Judge Haddon's sentencing that it was the conduct, that this is a defendant who has numerous, numerous alcohol-related criminal conduct charges that was the reason he enhanced the sentence and went upwards to that criminal history, that it wasn't based on the tribal court convictions. Even if it had been, we've put some significant authority in our brief for the fact that that can be done under certain circumstances. The jury instruction issue, I think that you also, in this case, have to keep in mind all of us do the standard of review, which is you look at the evidence in the light most favorable to the government to see if we have established the essential elements. And I think in this case, that evidence is there, and the jury could, from the instructions that were given as a whole, which we believe were absolutely correct. The instruction on reckless disregard was a little bit different than the one the defendant had submitted, but it was taken from what I can tell from U.S. v. Alvarez, which cites the Farmer v. Brennan case. And then the wanton disregard instruction that was given was identical to the defendant's. The defendant added another sentence on the end that's in it, in Farmer v. Brennan, is noted as, it's also been defined as. And so we didn't believe that both sentences were needed in that instruction. But we believe when you look at all of the evidence in this case and those jury instructions as a whole, and view the evidence in the light most favorable to the government, that there is evidence from which this jury could and did make the finding that, in fact, this was criminal and not just a tragic accident. How much of Red Eagle's sentence has been served right now? He was released the day of the conviction and was placed in custody again a week later for violating the conditions of the terms of his release by the various things that are contained in the record, kind of threatening kind of behavior to his family. Well, what is it, about a year? And so then he's been in since a week after he was convicted, which would have been in, what is this, January 28th of 2002, was his jury trial. A year and a little over a month. Yes. If he's given credit for the pre-sentencing incarceration time, which was sentencing occurred on June 6th. And so I would assume that Bureau of Prisons is giving him credit for that time. So that's even more. No. That would be the maximum. I thought you said he was picked up a year after January or a week after January 20th. Right. What happens? It's now March, so it's now a year and a little over a month. Yes. Plus whatever he had before. He didn't have any before that. He was only in jail one day, I think, when he was arrested. So that would be the most. What was his sentence? His sentence was the high end of the guidelines, which I believe was 27 months. And then he's been. Another year left. That's correct. Unless there are any further questions, I have one second left. Thank you. Just a couple of points I want to I want to touch on. The government indicates that this defendant had a long history of alcohol-related offenses, and those are outlined in the pre-sentence report. And while that's true, I think it's important for this court to know that none of those offenses were entered into evidence at time of trial. So the fact that this person had a long history of alcohol-related offenses was not something that the court should be concerned about. It was not something that was a part of this trial record, but rather is a record that was only made after trial at time of sentencing. The second thing I think that I would point out, and I think that the court has already touched upon this, but Mr. Mr. Red Eagle's alleged comments to his wife to watch the children, I don't think in any way rise to the level of evidence to show that he actually knew that his conduct in going to sleep would result in this sort of tragic accident. And it's also, I think, important to note that although his sister testified that she overheard him say that to his wife, his wife denied that he ever made those statements. By the way, it wouldn't have to show that he knew it would cause the accident, just that there would be a risk of it, right? I think a high probability, and it's almost knowing. I mean, you look at Farmer v. Brennan, and when the Supreme Court describes criminal recklessness, they talk about it almost knowing. Or short of that, you're almost looking at a willful blindness sort of situation, and they discuss that in Farmer v. Brennan. And I don't think either one of those is here. And then I think the third thing is the, and again, I think the court touched upon this, but the government wants to focus, I think, on the overall conduct here with Mr. Red Eagle getting drunk and that sort of thing. I think what you have to look at ultimately is his purpose in taking the baby. His purpose in taking the baby was to go to sleep with the baby. It would be a much different case if he had, quote, unquote, removed the baby from a situation of safety to take the baby on a drive or something and got into a tragic accident. Then I don't think we'd be here arguing this Rule 29 issue. On your theory of the case, is there any way that Mr. Red Eagle behaved with respect to this baby in a way that could be criminalized under the current criminal law? I don't know that the United States criminal code has any sort of negligent sort of criminal, you know, or statute that criminalizes negligent conduct as opposed to reckless conduct. I guess what I would say is that under the facts of this case, it may very well rise to negligence. I don't think it rises to the level of recklessness. In a case such as this, I think it's one way that the government could have gotten over its burden was to establish through circumstantial evidence or otherwise that Mr. Red Eagle actually knew or at least knew of a high probability that this sort of accident would occur if he had gone to sleep with his baby. Were there other tribal laws that were violated for which he could have been prosecuted? I think, as the government points out, there's a number of is a number of convictions for I can't remember the exact name of the crime. But I mean, this act could have been punished criminally under tribal law. Oh, absolutely. I think it could have. Yes, sir. Absolutely, you think? Absolutely, I think. Yes, sir. Okay. Thank you. Thank you. The case is arguably submitted. The Court will stand in recess for the day. All rise. This court for this session stands adjourned. Thank you.
judges: Reinhardt, W Fletcher, Gould